St. Louis Southwestern Railway Company of Texas v. L. K. Garber.

Decided May 16, 1908.

**1.—Witness—Impeachment.**

In attacking the reputation of a witness for truth and veracity it is not necessary to develop the impeaching witness's means of knowledge of such reputation in order to show his qualification to testify. If he answers that he knows the reputation it is sufficient.

**2.—Same—Reputation for Veracity—Form of Question.**

An impeaching witness was asked the following question: "Are you acquainted with the reputation of the witness M. in the community in which he resides, for truth and veracity?" Held, that in view of the connection in which the question was asked, it sufficiently appeared that the witness understood that the inquiry was concerning the general reputation of the person referred to, and the admission of the answer was not reversible error.

**3.—Same—Same—Form of Answer.**

An impeaching witness, in answering the preliminary qualifying questions, after stating that he knew the general reputation of the witness inquired about, added, "I reckon so, I have known him a long time," and, "I ought to be, I have known him always." Held, that the effect of the distinct affirmative statement that he knew the reputation of the witness in question was not destroyed by the explanatory statements of the impeaching witness, nor did it necessarily follow from said statements that the impeaching witness was simply stating his private opinion concerning the other witness.

**4.—Witness—Reputation—Lapse of Time.**

The fact that from four to twelve years had elapsed since the impeaching witness lived in the same community with the witness whose reputation for

truth and veracity is attacked, will not of itself disqualify the witness from testifying as to such reputation nor render his testimony inadmissible.

**5.—Witness—Impeachment—Notice.**

Neither the fact that an impeaching witness resides in a distant State nor that no notice had been given of the intended impeachment, will render inadmissible testimony as to the general reputation of a party's witness for truth and veracity.

**6.—Evidence—City Ordinances.**

A book or pamphlet on the back of which was printed a statement to the effect that it contained the ordinances of a certain city and that it was compiled by authority of the city council of such city, is competent evidence of the ordinances of such city under the provisions of article 558 of the Revised Statutes and the charter of the city to the effect that ordinances so published should be prima facie evidence of the validity of the city ordinances.

**7.—Ordinance—Enacting Clause.**

The presence of an enacting clause is indispensable to the validity of an ordinance, but such clause may be omitted when the ordinances are published in book form. To render an ordinance inadmissible because of the absence of an enacting clause it must appear affirmatively that there was no enacting clause when the ordinance was originally adopted.

**8.—Negligence—Concurring Cause.**

The negligence of a railroad company in failing to ring the engine bell when approaching a street crossing, or in running its train at an excessive rate of speed, may be a concurring though not a sole cause of frightening a team of horses near the crossing; hence, in a suit for damages alleged to have resulted from such negligence the court properly refused to charge the jury to return a verdict for the defendant unless they found that one or both of said acts of negligence was the cause of the injury.

**9.—Personal Injury—Pleading—Age of Injured Party.**

A distinct allegation of the age of an injured party is not necessary to admit proof of his age, probable life expectancy, future earnings, etc., when it is alleged that the injury is permanent.

**10.—Same—Measure of Damages—Charge.**

In a suit for damages for personal injuries, a charge on the measure of damages considered, and held not subject to the objections that it did not limit the jury to a consideration of such damages as resulted from the injuries received, and did not confine the jury to the limited capacity of the plaintiff to earn money by manual labor, as alleged.

**11.—Same—Diminished Capacity to Labor—Evidence.**

In a suit for damages for personal injuries, evidence considered, and held sufficient to authorize the submission of the issue and to warrant a recovery for diminished capacity to labor and earn money.

Appeal from the District Court of Hunt County. Tried below before Hon. T. D. Montrose.

*E. B. Perkins, D. Upthegrove* and *Templeton, Crosby & Dinsmore,* for appellant.

*J. P. Yates* and *H. L. Carpenter,* for appellee.

TALBOT, ASSOCIATE JUSTICE.—Appellee instituted this suit against the appellant to recover damages for personal injuries to himself, and injury to his wagon and team, alleged to have been sustained at a point

in the city of Greenville where appellant's railroad crosses Stonewall Street of said city. It is alleged, in substance, that on February 7, 1906, appellee was traveling along said street, riding upon a farm wagon loaded with seed cotton and drawn by four mules which appellee was driving; that when he was very near the street crossing and about to pass over the same, one of appellant's passenger trains approached said crossing, frightened appellee's mules, and caused them to overturn the wagon, which resulted in permanent injury to appellee, the breaking of his wagon and injury to his mules. The negligence alleged was: (1) In operating the train at a rate of speed in excess of that pre-scribed by one of the ordinances of the city; (2) the failure to ring the bell on the engine, as required by an ordinance of said city; (3) the failure to sound the whistle of the engine drawing said train or to give any other warning or notice of the train's approach; (4) suddenly sounding the whistle and ringing the bell of said engine when within about fifty feet of said crossing and appellee's team. The appellant pleaded the general issue, contributory negligence, and that if appellee was suffering from any physical disability the same was due to disease or some natural cause, and did not result from any injuries sustained in the alleged accident. The trial resulted in a verdict and judgment in favor of appellee for the sum of $4,200, and appellant has appealed.

. The first five assignments of error complain of the admission of tes-timony tending to impeach the credibility of appellant's witnesses, T. B. Marcum and S. P. Maness, who resided in the State of Virginia and who had testified upon the trial by deposition, that when appellee lived in said State of Virginia he was afflicted with rheumatism. This tes-timony was objected to on the ground that no proper predicate had been laid for its introduction, and the impeaching witnesses were not qualified to speak. The propositions under each of said assignments are the same and are in substance: That it appears from the testimony of appellee's witnesses that they had no means of knowing and did not know what was the present general reputation of the witnesses sought to be impeached, in the community in which they lived; that without such knowledge they were not qualified to testify concerning the repu-tation of the attacked witnesses for truth and veracity; that it appeared that the impeaching witnesses had not lived in the same community with the attacked witnesses for periods of time ranging from about four years to about twelve years, and that the attacked witnesses resided in a distant State, had testified by deposition, and, appellant having no notice of appellee's intention to attack the credibility of said witnesses, the court erred in admitting testimony to that effect. We are of the opinion that neither of these propositions should be sustained.

It is well settled, we know, that when the credibility of a witness is sought to be impeached, the inquiry must be restricted to his general reputation for truth in the community where he lives, or is best known, and the impeaching witness must speak from general reputation or re-port and not from his own private or individual opinion. But we do not believe this cardinal rule has been violated in the admission of any of the testimony complained of in this case. No particular form of question is prescribed or need be adhered to in eliciting from the im- .
peaching witness his knowledge of the general reputation of the witness

sought to be impeached for truth and veracity. Any form of words not involving a violation of the rule stated may be used. Boon v. Weathered, 23 Texas, 675; 1 Greenl. on Ev., sec. 461. Here each of the impeaching witnesses, except in two instances, as is pointed out in the first and second assignments of error, was asked: "Are you acquainted with," or "Do you know the general reputation" of the witnesses Marcum and Maness in the community in which they live for truth and veracity? To which an affirmative answer was given. The form of the question complained of by the first assignment is as follows: "Do you know his reputation, how he is generally regarded for truth and veracity where he lives?" and a like answer was given. These questions were in the form usually employed in such cases and sufficient to elicit the witness's knowledge of the general reputation of the witness sought to be impeached, and not the expression of his private opinion of the reputation of such attacked witness. This being true, it was not necessary for the appellee to develop the witnesses' means of knowledge of such reputation, in order to show their qualification to testify.

Under the second assignment, however, it is shown that the impeaching witness was not asked if he was acquainted with the "general reputation" of the defendant's witness, S. P. Maness. The form of the question here was: Are you acquainted with the reputation of the witness, Maness, in the community where he resides, for truth and veracity? the qualifying word, "general," being omitted. Now, it is true that the inquiry must be confined to the general reputation of the witness sought to be impeached and that the usual and more accurate way of putting the question is to ask the impeaching witness if he knows, or is acquainted, with the "general" reputation of such witness. But no rule can be laid down, it seems, as to the form of the question, and we do not understand that the prefix of the word "general" to the word reputation is indispensable. If the impeaching witness understands, when asked if he knows the reputation of the witness whose credibility is being attacked, that "reputation" has reference to his "general reputation"—that is, what is generally said of him in the community in which he lives—then the absence of the word "general" from the question will not render it so defective that the answer thereto will not be received. For with such understanding the question, with the word "general" omitted, will elicit from the impeaching witness, not his private opinion, but how the attacked witness is regarded generally for truth and veracity. The question then is, did the impeaching witness, Webb, in the present instance, understand that the inquiry made of him concerning the reputation of defendant's witness, Maness, for truth and veracity, called for information regarding his general reputation in that respect? We think so. This witness, before being interrogated about the reputation of Maness, was asked concerning the reputation of defendant's witness, T. B. Marcum, for truth in the community where he lived. The form of the questions put to him as to Marcum's reputation was: "Do you know his (Marcum's) reputation for truth and veracity in the neighborhood in which he lives?" The witness having answered this question, that he did not know whether he did or not, was then asked: "Do you know his reputation, how he is generally regarded for truth and veracity where he lives?" To which he answered, "Yes, sir, I

reckon so, I have known him a long time." Here the word reputation, as used, was by the language, "how he is generally regarded for truth and veracity where he lives," defined to the witness, and he was, in effect, thereby informed that it meant the general reputation of the witness, Marcum. Immediately following the examination of the witness regarding the reputation of Marcum, and after the word reputation had been thus defined to him, he was then questioned about the reputation of the witness, Maness, and the question now under consideration put to him. In view, therefore, of said examination of the witness Webb with reference to the reputation of Marcum, in which the definition of the word "reputation" was given in the question propounded to him in that examination, we think it fairly appears that when this same witness was asked in that connection if he was acquainted with the reputation of the witness, Maness, for truth and veracity in the community where he lived, he must have understood that the word reputation was used in the sense in which it had just been defined to him, and had reference to the general reputation of said witness.

Besides, other witnesses, whose testimony was practically the same as that of the witness Webb, were examined, touching the reputation of the witness, Maness, for truth and veracity, and in the question propounded to each of them the word "reputation" was qualified by the word general and called for proper answers under the rule governing in such cases. With the foregoing distinguishing feature in the case, the authorities cited by appellant's counsel in support of their position do not control a decision of the question.

But appellant further contends that the witness, Webb, was not qualified to speak to the general reputation of the witnesses sought to be impeached because, in stating that he knew the reputation of said witnesses for truth and veracity in the neighborhood where he resided, he qualified his affirmative answers, in the one instance, by saying, "I reckon so, I have known him a long time," and in the other by saying, "I ought to be, I have known him always." The contention is, in effect, that it is apparent from the qualifying language used that the witness' testimony was not based on the general reputation of the attacked witness, but upon his personal knowledge of him. This contention should not be sustained. The witness did, in both instances referred to, answer the question in the affirmative, following it up, it is true, with the alleged qualifying language quoted, but this language was not urged in the trial court, nor is it in this court, except by way of argument, as a specific ground for disqualifying the witness. Besides, we do not think it necessarily follows from the language used by the witness, Webb, in expressing his knowledge of the reputation of the witnesses, Marcum and Maness, that he was simply stating his private opinion and not what was generally said of them by those among whom they dwelt.

Nor do we think the impeaching testimony was inadmissible because it related to the reputation of the witnesses sought to be impeached at a time too remote from the trial, or because appellant had not been notified before the commencement of the trial that it would be offered. Clearly, under the authorities, the impeaching testimony of the witness, T. B. Garber, was not too remote (Mynatt v. Hudson, 66 Texas, 66);

and the characters of Marcum and Maness for truthfulness having been at least, to some extent, impeached by the testimony of this witness, the same could be followed up by the testimony of other witnesses although speaking of such characters at a more remote period.  Brown v. Perez, 89 Texas, 282; People v. Abbot, 19 Wend., 192.

With regard to the proposition that the impeaching testimony was inadmissible because the attacked witnesses lived in a distant State and appellant had not been notified before the trial that an attack would be made upon their credibility, it is sufficient to say that we know of no rule that requires such notice, under such circumstances, as a condition precedent to the introduction of the testimony.  Upon the whole, we conclude that no reversible error is shown in the admission of the impeaching testimony and appellant's several assignments of error complaining of the same will be overruled.

Appellant's sixth assignment of error complains of the court's action in admitting in evidence articles 132 and 133 of the ordinances of the city of Greenville, which prohibit the running of a locomotive, engine or car within the corporate limits of said city at a greater rate of speed than six miles per hour and without ringing the bell attached to such engine.  We think there was no error in this action of the court.  Our Revised Statutes, article 558, provides that: "All ordinances of the city where printed and published by authority of the city council shall be admitted and received in all courts and places without further proof," and section 7, article 10 of the charter of the city of Greenville provides that: "All ordinances of the city published in book form and purporting to be compiled by order of the city council shall be received by all the courts of the State of Texas as prima facie evidence of the due passage and publication of such ordinances as appear therein." Such was the character of the ordinances admitted in this case.  They were in a printed book or pamphlet on the back of which was printed a statement to the effect that the pamphlet contained the ordinances of the city of Greenville, compiled by L. L. Bowman, city attorney of said city, by authority of the city council of said city.  In addition to this L. L. Bowman testified, over the objection of appellant, however, that the printed book or pamphlet was the printed ordinances of the city of Greenville up to 1904; that they were compiled by the witness under the direction of the city council and that the book purported to be compiled "by the authority of the city council."  The book purporting to be compiled by authority of the city council, it was admissible in evidence, as shown by the provision of the statute and city charter quoted, without the parol evidence of the witness Bowman, and the admission of such parol evidence, if error, was harmless.  But we held in the case of Railway Company v. Garber, unreported, that parol proof that an ordinance had been published by authority of the city council was admissible, and that the production of the order to that effect as the best evidence of the fact was not absolutely necessary.

Nor did the court err to the injury of appellant in admitting in evidence the original ordinances offered by appellee.  The introduction of the original ordinances, like the parol evidence of the witness, Bowman, was unnecessary, we think, in view of the introduction of the published ordinances referred to, but the admission of them worked no

injury to appellant. We are also of the opinion that the further contention that the ordinances were without an enacting clause and therefore void should not be sustained. The question is not controlled by the decision in the case of Galveston, H. & S. A. Ry. Co. v. Harris, 36 S. W., 777. In that case it appeared from the evidence to the satisfaction of the court, that the ordinances introduced were not only published in pamphlet form without an enacting clause, but that the style, "Be it ordained by the city council of the city," which is required by law, was omitted in the framing and original adoption of said ordinances. In this state of the case the court held that the ordinances were void, saying: "While the statute allows the city council to omit the enacting clause of an ordinance when it prints or publishes the same, it is mandatory in its requirement in adopting an ordinance, the city council shall observe the language prescribed for the enacting clause." In the present case it does not appear that the style of the ordinances was omitted from the original draft of them and as passed by the city council.

Appellant's seventh, eighth and ninth assignments complain of that portion of the court's charge wherein the jury were instructed, that if, at the time of the accident in question, the appellant's locomotive and train were running at a higher rate of speed than six miles an hour, or if after entering the corporate limits of the city of Greenville, the bell of the engine was not rung and kept ringing while it was approaching the crossing of Stonewall Street, where said accident occurred, then in either event the appellant would be guilty of negligence. The objection to these instructions are based upon the theory that the evidence was insufficient to show valid ordinances of the city of Greenville prohibiting the operation of trains within the corporate limits of said city at a rate of speed greater than six miles an hour, or requiring the bell of a moving engine to be kept constantly ringing. Our conclusion under the sixth assignment of error disposes of these assignments adversely to appellant's contention. We hold that it was shown by competent evidence that valid ordinances were in force in the city of Greenville at the time of the accident complained of, requiring the bell of a moving engine to be constantly rung while such engine was being operated within the limits of said city and prohibiting the running of an engine or train therein, at a rate of speed in excess of six miles an hour.

The tenth assignment complains that the court erred in charging the jury that it was the duty of those in charge of a locomotive engine on a railway to blow the whistle and ring the bell at the distance of at least eighty rods from the place where the railroad shall cross any public street and a failure to do so is negligence. The ground of complaint is that the pleadings did not authorize this charge, and therefore it was calculated to mislead the jury to appellant's prejudice. We do not agree to this view. Appellee alleged, "that appellant's passenger train approached the place where the street upon which he was traveling crossed the appellant's track, without sounding the whistle or ringing the bell of the engine thereof—to indicate its approach—until said train was near said crossing, to wit: about fifty feet therefrom." These allegations, we think, were tantamount to a charge that appellant, in the operation of its train on the occasion in question failed to perform

the statutory duty embodied in the instruction, and authorized proof and the submission of that issue to the jury.

The thirteenth assignment of error is predicated upon the court's refusal to give a special charge requested by the appellant to the effect that if the engineer discovered the plaintiff's team approaching the crossing and that he sounded the whistle near the crossing for the purpose of giving warning to the driver of the team of the train's approach, and that a person of ordinary prudence situated as was the engineer, would have sounded the whistle under the circumstances, then such act would not be negligence, etc. There was no error in refusing to give this charge for the reason that there was no evidence to warrant it. Appellant's engineer, who was the only witness that testified upon this point, stated that when the train reached the place in question he gave the blast of the whistle for the crossing to comply with appellant's rules. Nowhere in his testimony is it intimated that he sounded the whistle at this place with the view of giving warning to the driver of appellee's team of the train's approach. He sounded the whistle, according to his uncontradicted testimony, for the crossing, as said, to comply with the company's rules. In this state of the evidence the charge was not called for, would probably have misled the jury, and was properly refused.

Complaint is made of the court's refusal to give the following special charges, requested by appellant:

1. "Even if you should believe from the evidence that the bell on the engine was not being rung as it approached the crossing where the alleged accident occurred, you would not be authorized to find for the plaintiff on that ground, unless you further believe from the evidence that the failure to ring the bell was the cause of the team taking fright and overturning the wagon."

2. "Even if you should find from the evidence that, at the time of the accident, the train was running at a rate of speed greater than six miles an hour you would not be authorized in finding for plaintiff on that ground, unless you further believe from the evidence that the excessive speed of the train was the cause of the team getting frightened and overturning the wagon."

We are of the opinion that the court did not err in refusing to give either of these charges. The evident object of requiring the bell of an engine to be rung while the engine is in motion in the corporate limits of a city is to give notice to those who may be approaching a street crossing of the approach of trains, that they may avoid the probable danger of placing themselves too near such trains; and the failure on the part of the railway company in this instance to ring the bell in compliance with the ordinance of the city of Greenville may be said to have been a concurring cause proximately contributing to appellee's injuries. So, too, with reference to running the train in the corporate limits of the city at a greater rate of speed than six miles an hour. If the ordinances of the city were being violated in this respect and because of the excessive speed of the train the danger of a collision with appellee's wagon and team was materially increased and the engineer thereby induced to give the sudden blast of the whistle, as described by the witness, and appellee's team took fright at such blast of the whistle, and overturned the

wagon, such excessive rate of speed may also be said to have been a concurring cause proximately contributing to appellee's injuries. St. Louis & S. F. Ry. Co. v. Smith, 90 S. W., 926. The charges under consideration ignored this phase of the case and were therefore inapplicable. But if the charges correctly applied the law to the facts the issues sought to be submitted were sufficiently covered by the court's main charge. In the sixth paragraph of that charge appellee's theory of the case was affirmatively submitted, and the jury were therein required to find, in order to return a verdict in favor of appellee upon the ground that appellant failed to have the bell of the engine constantly rung while its train was being operated within the corporate limits of the city of Greenville, or upon the ground that it caused said train to be run at a greater rate of speed than six miles an hour, that such was the proximate cause of appellee's injuries, and in the eighth paragraph of said general charge the jury were instructed that if the injuries to the appellee did not proximately result from the negligence of appellant in one or more of the respects submitted in the sixth paragraph of the charge, which included the issues of running the train at a rate of speed in excess of six miles an hour and of appellant's failure to ring the bell of the engine as required by the city ordinances, to find for the appellant. Hence we think there was no error in refusing the special charges asked.

It is assigned that the court erred in permitting the plaintiff to testify, over the objection of defendant, that he was forty-one years old at the time of the alleged accident. This testimony was objected to on the ground that there was no allegation of appellee's age in the petition, and the proposition is made that "when the age and life expectancy of an alleged injured plaintiff is material in order to determine the amount of his loss on account of his decreased capacity to labor and earn money in the future, the same should be alleged in the petition, and, if not alleged, proof thereof is not admissible." It was alleged that appellee's injuries were permanent and in such case we understand evidence of his age, probable expectancy of life and earnings, etc., is admissible upon the issue of his diminished capacity to labor and earn money in the future, to be considered together with all the evidence in estimating his probable loss. It was alleged, after stating the organs and parts of appellee's body that were injured, that all of said organs and parts of his body were seriously and permanently injured; that appellee was a farmer and as a proximate result of his injuries he had been permanently incapacitated to do the work of a farmer or any other manual labor, whereby his capacity to labor and earn money had been greatly and permanently diminished. In Texas & Pac. Ry. v. Bigham, 36 S. W., 1111, it is said: "Having pleaded that the injuries inflicted upon him were permanent, the plaintiff was correctly permitted to show his reasonable expectancy of life in connection with proof founded upon averments in his petition, showing the extent of his diminished earning capacity." See, also, Galveston, H. & S. A. Ry. v. Cooper, 2 Texas Civ. App., 42.

The court's charge on the measure of damages is attacked. The objections urged to the charge are, in substance, as follows: (1) That the jury were not thereby limited, in estimating appellee's damages, to such as were the result of the injuries sustained by him; (2) that the jury in estimating appellee's damages on account of his diminished ca-

pacity to labor and earn money, were not confined by said charge to his diminished capacity to earn money at manual labor in accordance with the allegations of his pleadings; (3) that neither the pleadings nor the evidence were sufficient to authorize a recovery for diminished capacity to labor and earn money. We think that neither of these objections is well taken. The charge tells the jury in its first sentence that if they find for the plaintiff the measure of his damages will be such sum as will now reasonably compensate him in cash for the injuries he has sustained. From this statement the jury must have understood that the court meant, in further telling them that in estimating such sum they would take into consideration the appellee's diminished capacity to labor and earn money and the physical and mental pain he had suffered and would suffer in the future, such diminished capacity to labor and earn money and such physical and mental pain as were due to the injuries appellee had sustained in the accident alleged. Besides, the jury were instructed at the request of appellant that they could not, in any event, allow the plaintiff anything for any injuries except such as were alleged and believed by them to have been in fact sustained by him.

As to the objection that the charge directed the jury, in estimating appellee's damages, to take into consideration his diminished capacity to labor and earn money without restricting his recovery on that account to his diminished capacity to earn money at manual labor in accordance with his pleadings, it may be said that the charge in that respect was probably beneficial, rather than damaging to appellant, and if not, there was no evidence that appellee's capacity to earn money was diminished in any other way than in the pursuit of his avocation as a farmer, and it will be presumed that the jury in determining the amount of the verdict confined themselves to the evidence introduced on the trial.

We also think the pleadings and evidence were sufficient to authorize the submission of the issue and warrant a recovery for diminished capacity to labor and earn money. Among other things, appellee alleged that as a farmer he had a reasonable earning capacity of, and could and did earn, $1,000 per year; that by reason of the injuries sustained in the accident in question, he was wholly incapacitated and prevented from earning any sum for a period of one month; that as a further proximate result of said injuries he has been permanently incapacitated to do the work of a farmer or any other manual labor, whereby his capacity to labor and earn money has been greatly and permanently diminished. There is evidence tending to show that prior to his injuries appellee was a strong, healthy man, capable of doing as much or more work than the average farmer; that his injuries are probably permanent and have and will in the future greatly impair his ability to earn a livelihood. At the trial of the case, which was about sixteen months after the accident occurred, appellee testified: "Since that time I have had a hurting more or less in my chest, take spells, I can't hardly breathe and can't lay on my back. The pain is right here in my chest, I take spells of being hoarse. I can't hardly talk, am that way now. I take spells of coughing, have coughed blood several times. It was my right leg that was hurt. Ever since the accident it has hurt me more

or less all the time—that right leg is weak, can't walk to do any good, it hurts and gives out. I can't lift or do anything of that kind on account of my bowels and chest. I did nothing to amount to anything during the summer because I could not. I have not done anything myself since my injuries. Before I received these injuries I was farming out here, plowed and did anything that was to do on the farm. I am not able to farm now." Dr. Young, appellee's family physician, testified that he treated appellee for his injuries; that he found a large bruised place over his left lung, as well as other bruises and evidences of injury; that over appellee's left lung there is now a dullness and flatness of pitch; that there are sounds when he gets his breath, noises that ought not be there in a normal lung; that, in his opinion, the injuries received by appellee in the accident caused the condition described in his lung. This witness further testified that he considered the nerve in appellee's leg injured, the joint having been twisted; that the prospects of appellee's leg getting well are not very favorable. We have not attempted to give all the evidence bearing on this question, but only so much as is necessary to an understanding of our ruling. From this and other testimony in the case we think it apparent that the case of Houston & T. C. Ry. v. Bird, 48 S. W., 756, cited by appellant, is not in point. The jury by the facts established in the present case were not left to a mere conjecture or guess in fixing the amount of appellee's damages. As said in Texarkana & Ft. S. Ry. v. Toliver, 37 Texas Civ. App., 437: "The nature of appellee's injuries are such as will necessarily prevent him from continuing in the business in which he was engaged at the time he was injured, and will greatly lessen his capacity to earn money by physical labor of any kind. His capacity to earn money in avocations generally being affected by the loss of his leg, he was not required to show what his present earning capacity was in order for the jury to assess the amount of compensation to which he was entitled by reason of his decreased capacity to earn money, but the amount could be determined by the jury from their common knowledge and experience and sense of justice."

Again, in passing upon the sufficiency of the evidence to authorize the submission of the issue of diminished capacity to labor and earn money in the case of Street Railway Company v. Motwiller, 101 Texas, 515, the Supreme Court said: "The law only exacts the kind of proof of which the fact to be proved is susceptible, but it does exact that. The earning capacity of the plaintiff in this case, as a stenographer, was probably susceptible of definite proof. If it was otherwise, the facts which made it so should have been shown to have entitled her to have the jury estimate it in their own judgment without fuller proof and to allow full compensation as for a diminution in the amount of her earnings. Nevertheless, if there is evidence to show with sufficient definiteness the loss of any part of that which she would have earned but for her injuries, the submission of that element was justified. It appears that before she was hurt she could and did walk to and from her work and that since her injuries she has been compelled to ride upon the street cars. From their own general knowledge and experience the jury could say that this diminished to some extent the returns from her employment, and we think this evidence was as definite as should be

required to show loss of earning power to the extent indicated by it. Evidence is adduced to put the jury in possession of facts from which they can determine the extent of impairment of earning power and is not intended in itself to establish a fixed measure of damages. When the jury are informed of such a fact as that just stated they have enough to enable them to allow something upon that score. That they are not so informed as to permit them to allow for the full extent of such loss, is no reason for saying that they can not allow for the part of which they are sufficiently informed."

In deference to the verdict of the jury we conclude that the evidence justified their finding that appellee was injured through the negligence of appellant's servants; that he was not guilty of contributory negligence, and has sustained damage in the amount awarded; that none of appellant's assignments of error, all of which have been carefully considered by this court, authorize a reversal of the case, and the judgment is, therefore, affirmed.

*Affirmed.*

Writ of error refused.